# GRAHAM v. MUTUAL REALTY COMPANY.

(134 N. W. 43.)

**Taxes —— verification of assessor's return.**

1. The verification of the assessor's return provided for in § 1525, Rev. Codes 1905, before the city auditor, instead of the county auditor, as prescribed in said section, will not, in itself, invalidate the assessment.

**Taxes — agreement to stifle competition at tax sale.**

2. An agreement to stifle and eliminate competition at a tax sale must, in order to render such sale void as to any particular tract of land, relate to and affect such tract.

**Taxes — notice to redeem from tax sale.**

3. *Held*, that a notice to redeem from a tax sale, to the effect that, "You are hereby notified that on the 5th day of December, 1905," etc., a specifically described tract of land "was sold for taxes due and delinquent thereon for the year 1905, as provided by law, that the amount for which the same was sold was $25.68, that the subsequent taxes levied thereon for the years 1905, 1906, 1———, were paid by the purchaser, amounting to $67.11, that the time for redemption from said sale allowed by law will expire ninety days after the service of this notice, that the amount required to redeem said real property from said sale of 1904 taxes is $139.51," etc., was sufficient even though the year "1907" was not written therein in full; it being shown that the taxes for the year 1907 were included in the total sums of $67.11 and $139.51, specified in said notice.

Opinion filed December 21, 1911.

Appeal from District Court, Cass county; *Pollock, J.*

Action by Samuel S. Graham against the Mutual Realty Company. From a judgment for defendant, plaintiff appeals.

Affirmed.

Facts: Action to quiet title to lot 15, block 7, in Kenney & Devitt's addition to the city of Fargo, and to have declared void defendant's claim under a tax certificate of sale for unpaid taxes for the year 1904, and a tax deed issued thereon in November, 1909, and for the taxes for the years 1905, 1906, and 1907, subsequently paid. Judgment for the defendant, and appeal under the Newman law. The reasons assigned by the plaintiff and appellant for holding defendant's interest to be void are: (1) That the assessors failed to properly verify their assessments for the years 1904, 1905, 1906, and 1907, the several assessments having been sworn to before the auditor of the city of Fargo, instead of before the county auditor, as prescribed by § 1525, Rev. Codes 1905 (chapter 28, Laws of 1901); (2) that the tax sale was void because of an unlawful arrangement between the bidders, whereby competitive bidding was stifled and eliminated; and (3) that no notice of redemption was given to the defendant by the county auditor prior to the issuing of the tax deed.

*Pollock & Pollock,* for appellant.
*Barnett & Richardson,* for respondent.

BRUCE, J. (after stating the facts as above). The first point made by appellant, that the returns made by the city assessor of the city of Fargo were verified before the city auditor, instead of by the county auditor, was passed upon adversely to the appellant in the case of State Finance Co. v. Mather, 15 N. D. 386, 109 N. W. 350, 11 Ann. Cas. 1112, and though that case was decided by a divided court, and to all intents and purposes overruled and reversed the prior decision of Eaton v. Bennett, 10 N. D. 346, 87 N. W. 188, we feel constrained to follow its holdings.

The next point is a much more difficult one to decide. There can be no question that competition was particularly stifled and eliminated at the tax sale of 1904. Out of 1917 sales, 856 were made at 24 per

cent and 5 per cent penalty. Only 61 sales were made at less than 24 per cent and the penalty. Averaging the sales among the purchasers, there would practically be one purchase for each bidder below the full maximum. Fifty-nine different firms and persons were interested in the sale, so that there must have been some demand for the investments. The witness Twitchell testifies, for the plaintiff, that "there was a meeting of most of the bidders immediately preceding the sale, trying to make some arrangements to get 24 per cent and 5 per cent penalty. Nearly everyone there agreed to it before the sale. They carried out such arrangement at the sale. The arrangement was to bid in rotation, and it was carried out. The exceptions to the arrangement as to rotation were as to mortgages and previous certificates held by purchasers, and as to some small descriptions, which many bidders did not want, and also with respect to the special taxes offered; it being understood that the one who had the general tax should have preference as to the special tax. If he did not want the special tax, somebody else took it, and he did not lose his turn. Mr. Wooledge, the purchaser of the lot in question at the sale, was an active participant in the bidding in rotation." The witness also testified that he was himself a party to the arrangement, and a bidder at the sale. Another witness testified that he purchased certificates for different parties, had other bidders to assist him, participated in the regular order, and took certificates that came in regular rotation; that there was an agreement among the bidders that it would be proper for each bidder only to secure the amount that came to him in his regular order.

On the other hand, J. D. Wooledge, who secured the certificate in question, and who afterwards sold it to the defendant, the Mutual Realty Company, denies that he entered, at any time prior to or during the sale, into an understanding or agreement limiting or restraining his right to bid, or the amount which he should bid, or the manner or time in which he should bid, with anybody, and states that he was not present at any talk or understanding among the respective bidders at which any such agreement was made. He, however, on cross-examination, admitted that he made the announcement at the sale, on behalf of his company, the Red River Valley Mortgage Company, as to prior mortgages and prior certificates, if such company or himself had any, and admits that it was the practice of others to make the same an-

nouncements, from time to time, during the sale, so that there would be no competitive bids, and also admits that for a considerable portion of the time during the sale the bidding was going on around the room in rotation as to bidders, but he would not say that this program continued throughout the entire sale.

Another bidder, Mr. H. J. Rusch, denied that he himself entered into any agreement for eliminating competition, but admitted that there was an attempt to make an arrangement, which, he said, he thought was not carried out. "They kicked over the traces occasionally." He said that such agreement had been attempted at every sale that he had been to. His testimony is to the effect that there was rotation in the sales in regard to farm lands, but not as to city property. He said that there was a lot of competition for the size of the crowd, "though, as a rule, there was possibly only one bid for the maximum interest and penalty." He also admits that a great many bidders, from time to time, called out, "Prior certificates!" also, "Mortgages!" His explanation was this: "For instance, I bought a certificate this year, and paid subsequent taxes in March. I would let that run to another sale, in order to get the penalty, and the bidders around the room would recognize that right. I don't know as I had any right; but they would recognize that right, if any gentleman in the room said he had a prior right or mortgage, and the others would not bid against it." On being asked, "You don't remember that he bid in at less than 24 per cent, and 5 per cent penalty?" He answered: "I would not say, unless the records show. I think the next year we started to. I was supposed to be the outlaw next year, because, I think, I was the one that started the cut, because I thought they were getting a good investment, and I went in there with the understanding that I was to get what I wanted, and as much as I wanted."

The county auditor also testified that he had no knowledge of the arrangement or agreement as to bidding in rotation; that, except as to some individuals, bids were made in rotation, but he could not say that was true as to the majority of the bidders at the sale, and could not say that it was not. "There were certain individuals that would release their—They would not bid against others; but there were some there that were in competition at all times."

Mr. J. A. Glassford testifies that he was present at the sale to bid

for the defendant, the Mutual Realty Company (which afterwards pur-
chased the certificates in question from Wooledge); that whether he had
bid in his own name or for the company was simply a matter of conven-
ience, and that, if he made purchases in his own name, the certificates
were immediately assigned to the defendant company; that there was
no arrangement between the bidders, or collusion among them, so far
as he knew; that all bidding was free and open at all times; that the
property in question was sold, while he was present, to Mr. Wooledge.
This witness, however, was not cross-examined, owing to some misunder-
standing.

Mr. Twitchell, the principal witness for the appellants, also admitted
that there may have been some time in the morning when the deal did
not exist; that "the Red River Valley Mortgage Company, represented
by Mr. Wooledge, broke away from the agreement very largely, and
got more than their share. Competition was not very strong."

We have, then, a case where, if an agreement to eliminate compe-
tition was made, the original purchaser broke away from it, and was not
controlled by it, and where the defendant in the case is an innocent and
bona fide purchaser. The case is one, also, where there is no doubt that
there was an attempt to eliminate competition, which was carried out to
a large extent, though there were bidders who were not controlled by
it. The evidence, of course, is not entirely clear. Out of 917 sales,
only 61 were for less than 24 per cent, and the penalty; that is to say,
6½ per cent of the sales. Many of the sales, however, were at a low
rate of interest, and the fact that mortgagees were allowed to bid in the
property in which they were interested is not, in itself, any proof of
fraud. As was well said, indeed, by the trial judge in his memoran-
dum opinion; "A mortgagee or lien holder stands about in the same
position as would the owner of the property in reference to paying the
taxes thereon. A mortgagee purchasing at a sale cannot secure any
rights under the sale as against the mortgagor. He would simply, as
between him and the mortgagor, be considered as having paid the tax-
es. Suppose that several owners of the land had been present at the
sale, and, by outstanding agreement, these owners were allowed to bid
in their own land, could it be said that there was an unlawful combi-
nation among the bidders? I see no difference between this situation
and the one where the rights were extended to the mortgagees to bid

in such property, so that this evidence with reference to mortgagees and lien holders hardly amounts to the position where it creates even an inference as against the regularity of the sale." From the proof it is evident that quite a number of the sales were made to such mortgagees.

As far as the authorities are concerned, every presumption is in favor of the sale. Beeson v. Johns, 59 Iowa, 166, 13 N. W. 97. And in none of the authorities cited by appellant was there any competition at all. In all of the cases cited by counsel, indeed, there was an illegal combination among all of the bidders at the tax sale, including the person who bid in the land. See Youker v. Hobart, 17 N. D. 296, 115 N. W. 839; Frank v. Arnold, 73 Iowa, 370, 35 N. W. 453; Johns v. Thomas, 47 Iowa, 441; Slater v. Maxwell, 6 Wall. 268, 18 L. ed. 796; Singer Mfg. Co. v. Yarger, 2 McCrary, 583, 12 Fed. 487. Neither are all of the authorities cited by counsel for respondent entirely in point. All that is decided in Beeson v. Johns, 59 Iowa, 166, 13 N. W. 97; Davis v. Harrington, 35 Kan. 196, 10 Pac. 532, and Gallaher v. Head, 108 Iowa, 588, 79 N. W. 387, for instance, is that a fraudulent combination cannot be inferred from a failure to compete, alone, or very little competition. It seems to be the undoubted rule, however, that, in order to avoid a sale as against a bona fide grantee for value—and such the defendant appears to be in this case—the agreement to eliminate competition must have had reference to the particular tract in controversy, and a mere arrangement "in reference to many pieces of land will not be extended to any particular one without proof." Eldridge v. Kuehl, 27 Iowa, 160. even where there is a complete absence of competition says Judge Cooley, the invalidity of the sale "is not absolute, as in case of a sale without jurisdiction; it is rather a cause for avoiding the sale than a cause which, *ipso facto,* defeats it; and if, before the proper remedy is sought, the land comes to the hands of a bona fide purchaser who was ignorant of the fraud, he will be protected in his title." "Perhaps, also," the author continues, "the purchaser at the sale should be protected if he did not participate in the fraud, and was unaware of it." Cooley, Tax. 2d ed. p. 491; Sibley v. Bullis, 40 Iowa, 429; Watson v. Phelps, 40 Iowa, 482; Huston v. Markley, 49 Iowa, 162; Martin v. Ragsdale, 49 Iowa, 589; Case v. Dean, 16 Mich. 12; Martin v. Cole, 38 Iowa, 141; Van Shaack v. Robbins, 36 Iowa, 201.

The fact that the witness Glassford was an officer of the defendant, and was present at the sale, does not change the situation or make the Mutual Realty Company any the less an innocent purchaser. Even if the knowledge of such agent could be imputed to his principal, there is no proof in the record that Glassford had any knowledge of any illegal combination, or was in any way a party to such. His testimony, indeed (and his is the only testimony upon this point), is absolutely to the contrary. As far as the proof in this case, therefore, is concerned, the Mutual Realty Company is an innocent purchaser, and, at the time of the purchase of the tax deed from Wooledge, had no knowledge of any fraud committed at the sale; nor is the proof by any means conclusive that even the witness Wooledge, who made the purchase at the tax sale, was a party to any illegal combination. All that the witness Twitchell says is that "there was a meeting in the room where the sale was to be held just before the sale started, but nothing was done, except that we talked about the sale. About all there was there were trying to get the land at 24 per cent; that is, were trying to get the taxes sold at the maximum. We tried to enter into some kind of a deal and bid in rotation, and thus take the lands at the maximum. Nearly every one there agreed to it. They carried out this arrangement. . . . There may have been some time in the morning when the deal did not exist. My recollection is that Mr. Wooledge was a party to the arrangement. I remember Mr. Wooledge got quite a number of descriptions there; and I remember distinctly his calling these certificates and mortgages, and getting tracts in that way, without any competition. The Red River Valley Mortgage Company, represented by J. D. Wooledge, broke away from the agreement very largely, and got more than their share," —while the testimony of Mr. Wooledge is to the effect that he had no understanding with the other bidders, and was not present at the meeting of the bidders. The proof does not show such an absence of competition, connected with the land in controversy and the defendant, as would justify the court in setting the sale aside.

Nor do we believe that the defects in the notice to redeem would justify us in doing so. The plaintiff, by such notice, was fully acquainted with the amount of money which he was called upon to pay, and with the time within which he was required to redeem. He was informed of the tax sale for the taxes of 1904, and of the payment of

subsequent taxes of 1905 and 1906. His attention was also called, by the figure "1," followed by a dash, to the fact that some other year was, or probably had been, partially written in. Being the owner of the land, he must have known that the taxes for the year 1907 were not paid. The purpose of the notice was fully subserved. To overcome the presumption of regularity, it is not enough to show facts from which an inference of irregularity may be drawn, if they were not inconsistent with the existence of other facts which would establish the correctness of the proceedings. Case v. Dean, 16 Mich. 12.

The judgment of the District Court is affirmed.